# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00835-COA

**ROBERT SMART, JR. A/K/A ROBERT SMART**          APPELLANT

**v.**

**STATE OF MISSISSIPPI**                                             APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/08/2020 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH III |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | DANIEL ELLIS MORRIS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/03/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., LAWRENCE AND McCARTY, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1.     A Bolivar County Circuit Court jury found Robert Smart guilty of exploitation of a child (C.R.)[1] in violation of Mississippi Code Annotated section 97-5-33(6) (Rev. 2014). The trial court sentenced Smart to twenty years in the custody of the Mississippi Department of Corrections (MDOC), with ten years suspended and ten years to serve, and ten years of probation following his release.  Smart was also required to register as a sex offender.

¶2.     Smart appeals his conviction and sentence, asserting that (1) the trial court erred by

---

[1] The victim was a minor at the time the contact took place.  The Court will therefore refer to him as C.R. and his mother as Jane throughout this opinion.

admitting into evidence social media screenshots purporting to be messages between Smart and the victim (C.R.); and (2) the State committed prosecutorial misconduct during closing arguments with respect to certain references to these social media messages. We find Smart's assignments of error are without merit. Accordingly, we affirm Smart's conviction and sentence.

**FACTS AND PROCEDURAL HISTORY**

¶3. This case stems from (1) an alleged physical interaction in the spring of 2015 between Smart, a special education teacher at DM Smith Middle School in Cleveland, Mississippi, and C.R., who was thirteen years old and in eighth grade at DM Smith Middle School at the time; and (2) subsequent social media and text messages allegedly exchanged between Smart and C.R. The social media and text communications took place the following fall when C.R. was in ninth grade at Eastside High School (and no longer at DM Smith Middle School).

¶4. Smart was indicted on one count of sexual battery by a person in a position of trust or authority occurring between March 1, 2015, and May 31, 2015, in violation of Mississippi Code Annotated section 97-3-95(2) (Rev. 2014) and one count of exploitation of a child occurring between September 1, 2015, and September 15, 2015, in violation of section 97-5-33(6). After a jury trial, Smart was convicted of child exploitation. The jury did not reach a unanimous verdict on the sexual battery charge.

¶5. C.R. testified at the jury trial held in the Bolivar County Circuit Court in November 2019. C.R. testified that when he was in eighth grade at DM Smith Middle School, he was

2

caught with liquor at school. Instead of being expelled, he was sent to Smart to talk with him about his feelings when he got drunk, and he "continue[d] to go to [Smart's] class[room] for talking or [he] would go in there [to work on reading enhancement skills]."

¶6. One day, when C.R. was alone with Smart in Smart's classroom, C.R. fell asleep at a table. C.R. testified that he woke up to Smart standing beside him. Smart told C.R. to "pull [his] pants down." Smart then "bent over and proceeded to give [C.R.] oral sex." C.R. said that "once [Smart] finished, he told me to let it happen and he forced my head towards his penis and made me perform oral sex on him."

¶7. C.R. testified that afterward, Smart paid him $50 "to keep quiet about it" and suggested they communicate through the messaging application Kik. Smart told C.R. that his Kik username was "smartgye." Smart gave C.R. his cell phone number, and the two continued communicating through text and Kik messages. Smart "would send [C.R.] pictures and stuff like males having sex type of stuff." "[O]ne day he sent [C.R.] a picture of a wall with [d]ildos and he was like to [sic] compare his penis to the one of [sic] the wall[.]" Smart continued messaging C.R. into the fall when C.R. began ninth grade at a different school. He wanted C.R. to "come to DM Smith after school to just come and see him" and do "sexual stuff with him again."

¶8. C.R. then testified that one day (later identified as September 15, 2015),

> I was sitting at home and doing my homework. It was like I was . . . . I didn't know how to tell my mom about the situation. So while I was doing my homework, I left my phone open on the messages. And so she seen the messages . . . and scrolled through it and she told me to tell Mr. Smart she was

calling the police on him.

[STATE:]    Did you do that?

[C.R.:]     Yes, ma'am.

[STATE:]    At your mom's direction?

[C.R.:]     Yes.

¶9.    C.R.'s mother, Jane, also testified at trial. She corroborated C.R.'s explanation of how she saw the explicit messages, and she testified that when she saw them, she told C.R. to tell the sender that she was calling the police. About 5:05 p.m., C.R. sent two messages stating, "My momma callin['] the police on you" and "She read my text messages[.]"[2] His mother then took screenshots of the messages and sent them to her phone. C.R. testified that Smart immediately began calling C.R.'s phone, and Jane testified that C.R.'s phone immediately began ringing. At that time, Jane had the phone and rejected the calls.

¶10.   Phone records from C.R.'s phone were entered into evidence through the State's witness, David Walker, an AT&T records custodian. Walker's testimony and the phone records show that four calls were made from Smart's phone (ending in 0321)[3] to C.R.'s

---

[2] Exhibit 7D was admitted into evidence and is a screenshot of these Kik messages. This exhibit showed that the screenshot was taken at 5:05 p.m., and the "callin['] the police" message was sent "a minute ago." Both C.R. and his mother testified that the screenshots were taken right after C.R. sent the Kik messages to Smart.

[3] The State's witness Dr. Jacquelyn Thigpen was the superintendent of the Cleveland School District during the relevant time period. She confirmed that Smart was employed as a special education teacher at DM Smith Middle School from August 14, 2013, to October 5, 2015. She also confirmed that Smart's cell phone number was xxx-xxx-0321.

phone (identified by specific digits) between 5:07 p.m. and 5:21 p.m.[4] None of the calls were answered, and the records show the calls went to voicemail.

¶11.    The State's witness Angela Towers was the principal of Cypress Park Elementary School in Cleveland and testified about her interactions with Smart on September 15, 2015, when he came to the school after hours looking for C.R.  Towers testified that a couple of weeks after Smart had been to the school, she heard that there had been "alleged inappropriate contact" between Smart and C.R., so she prepared a memo about her encounters with Smart on September 15 when he had specifically asked for C.R.

¶12.    Towers knew Smart and that he taught at the middle school (not at the elementary school).  She testified that Smart came to the elementary school "a couple of times, two or three times" that day.  She recalled that Smart returned to the elementary school that evening around 5:10 p.m., and "[h]e came specifically for [C.R.]."[5]  Towers told Smart that C.R. was not there and started to talk about upcoming school events.  "And he kind of just hurriedly, you know, brushed me off . . . ."  Towers testified that she "just found it unusual that Mr. Smart would be in the building at that time looking for a student[.]"

¶13.    The following morning, C.R. had his phone back.  He testified that he was at the bus

---

[4] Walker testified that the AT&T records show the Universal Time Coordinated (UTC) time-stamp, which is the time according to the World Clock in Greenwich, England and is expressed in military time.  He explained that to convert the UTC time-stamp to Central Daylight Savings Time, five hours must be subtracted from the UTC time-stamp.

[5] At first Towers did not know who C.R. was, but after Smart "got her to recognize who [C.R.] was," she realized that C.R.'s aunt was a teacher's assistant at the elementary school and that C.R. usually came over there after school to ride home with his aunt.

stop and that "[Smart] texted me and . . . he continued to tell me [to] tell my mom that it was a joke and . . . for me to come and talk to him after school that day[.]" C.R.'s mother also testified that C.R. told her that morning that Smart had texted him, "[Y]our mom thinks I'm a pedophile now."

¶14. C.R. did not meet with Smart. Instead, he went to the Cleveland police station with his mother. There, investigators took photos of the screenshots of the Kik messages. Jane testified that at that time, C.R. "was still kind of somewhat in denial" and not ready to give a statement. Later that evening, C.R. told her that he was prepared to tell the truth. So C.R. and his mother met with an investigator, Detective Dudley Tribble, and the city attorney. C.R. gave a statement about what happened in Smart's classroom and their communications afterward. Detective Tribble testified that he took photos of the screenshots from C.R.'s phone on September 16, 2015, and gave the phone back to C.R.'s mother. Detective Tribble later collected C.R.'s phone on October 7, 2015, in order to have an extraction report generated from the phone.

¶15. In the meantime, C.R.'s mother told C.R. to uninstall the Kik application and block Smart's phone number on his phone. C.R. did so. He testified that once he uninstalled Kik, the application permanently deleted all the messages between him and Smart, and when he blocked Smart's phone number, his phone deleted all the text messages between them. C.R. admitted that even though he had deleted the Kik application on the morning of September 16, 2015, he later reinstalled it. He testified that "smartgye" came back as a contact in the

Kik application, but he had no further communication with Smart after he reinstalled the Kik application.

¶16.    The State's computer-forensics expert, Charles Rubisoff, testified that he examined C.R.'s phone (collected from C.R. on October 7, 2015) and generated an extraction report. He testified that he found the Kik application had been installed on October 3, 2015, and explained that it was his "experience, when the application is deleted [such as the Kik application], the supporting files for the application . . . [are] deleted as well." So, if a person deletes the Kik application and reinstalls it, that would typically reset any content or information that had been associated with the application prior to the deletion. Rubisoff also confirmed that other content on a phone may be unrecoverable if the content has been deleted.

¶17.    Specifically with respect to C.R.'s phone, Rubisoff testified that the reinstalled Kik application did not contain any information prior to October 3, but he found "smartgye" on C.R.'s phone as "a username stored in a database file that is used by the Kik app." He did not find any communication from "Robert Smart" to C.R. or from C.R. to "Robert Smart" on C.R.'s phone.

¶18.    Rubisoff also generated an extraction report from Jane's phone. He found the screenshots sent from C.R.'s phone to Jane's phone containing the Kik messages. The extraction report was admitted into evidence, and Rubisoff explained the time-stamp associated with each screenshot contained in the extraction report, indicating that the

7

screenshots were sent from C.R.'s phone to his mother's phone beginning at 5:09:54 p.m. and ending at 5:11:50 p.m. on September 15, 2015.

¶19. The State rested. The defense moved for a directed verdict, which the trial court denied. The trial court advised Smart of his right to testify, and Smart declined.

¶20. The defense then presented the testimony of its digital forensics expert, Dan Meinke. Meinke examined the extraction reports for C.R.'s and Jane's phones that he obtained from the State's expert. Like Rubisoff, Meinke testified that he found the Kik application was installed on October 3, 2015, and he did not find any messages between "smartgye" and C.R. Like the State's expert, Meinke did not find the name "Robert Smart" on C.R.'s phone. Meinke admitted on cross-examination that "smartgye" was "listed in the contact section of the . . . Kik database."

¶21. After the trial court instructed the jury and the closing arguments were presented,[6] the jury deliberated. The jury found Smart guilty of child exploitation (Count II of the indictment).[7] The trial court sentenced Smart to twenty years in the custody of the MDOC, with ten years suspended and ten years to serve, and ten years of probation following his release. Smart was also required to register as a sex offender.

---

[6] One of Smart's assignments of error on appeal concerns the State's alleged prosecutorial misconduct in closing arguments. We discuss the facts relating to this issue below.

[7] As noted, the jury did not reach a unanimous verdict on Count I (sexual battery).

## I.      Admission of the Kik Messages into Evidence

¶22.    Smart asserts that the trial court erred in failing to exclude the "unauthenticated" Kik messages. As addressed below, we find the trial court did not abuse its discretion in admitting the Kik messages because the State properly authenticated the messages pursuant to Mississippi Rule of Evidence 901 and the applicable caselaw. We therefore find that this assignment of error is without merit.

¶23.    Rule 901 requires that evidence be authenticated as a condition to its admission. MRE 901(a). "Whether the evidence presented satisfies Rule 901 is a matter left to the discretion of the trial judge. His decision will be upheld unless it can be shown that he abused his discretion." *Falcon v. State*, 311 So. 3d 1186, 1187 (¶6) (Miss. Ct. App. 2020), *cert. denied* (Miss. Feb. 11, 2021).

¶24.    Pursuant to Rule 901, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence *sufficient to support a finding* that the item is what the proponent claims it is." MRE 901(a) (emphasis added). "Thus, under Rule 901, a party need only make a prima facie showing of authenticity . . . . Once a prima facie case is made, the evidence goes to the jury *and it is the jury who will ultimately determine the authenticity of the evidence, not the court*." *Falcon*, 311 So. 3d at 1187 (¶7) (emphasis added) (citation and internal quotation marks omitted).

---

[8] We address the standard of review applicable to each issue in its context.

¶25. Regarding social media communications like the Kik messages at issue here, the Mississippi Supreme Court has recognized that "[t]he authentication of social media poses unique issues regarding what is required to make a prima facie showing that the matter is what the proponent claims" due to "the special concerns regarding fabrication" surrounding such communications. *Smith v. State*, 136 So. 3d 424, 432-33 (¶¶19-20) (Miss. 2014). To address this situation, the supreme court set forth a non-exhaustive list of ways in which "a prima facie showing of authenticity" of social media messages may be established, including the following:

[1.]  the purported sender admits authorship,

[2.]  the purported sender is seen composing the communication,

[3.]  business records of an internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have access to the computer or cell phone,

[4.]  the communication contains information that only the purported sender could be expected to know,

[5.]  the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or

[6.]  other circumstances peculiar to the particular case may suffice to establish a prima facie showing of authenticity.

*Id.* at 433 (¶21).

¶26. Smart asserts that the State presented no evidence of examples one through three, and

10

he further asserts that the State presented no circumstances falling within examples four through six. In support of this argument, Smart asserts that both the State's expert and his own expert testified that they did not find any communication from "Robert Smart" to C.R. or from C.R. to "Robert Smart" on C.R.'s phone.

¶27. We recognize that C.R.'s phone had no reference to "Robert Smart" on it, but we also recognize that the State presented evidence and testimony explaining why C.R.'s phone no longer contained any communications between C.R. and Smart. C.R. testified he deleted the Kik application on September 16, 2015, before the police took his phone to be examined. The State's digital forensics expert (Rubisoff) confirmed that "when [an] application is deleted, the supporting files for the application . . . [are] deleted as well." Although C.R. admitted that he reinstalled the Kik application in October 2015, he testified that he had no communications with Smart through the reinstalled Kik application. C.R. also testified that he blocked Smart's phone number, losing all text messages from Smart. Rubisoff testified that other content on a phone may be unrecoverable if the content has been deleted.

¶28. Thus, we look to other ways in which the State may establish a prima facie showing of authenticity under the viable options delineated in *Smith*. We find that the State has done so under three such options in this case: The Kik messages contained information that only Smart could have been expected to know; Smart responded to the Kik messages in such a way as to indicate circumstantially that he was the author of the communication; and other circumstances peculiar to the case show his authorship. *Smith*, 136 So. at 433 (¶21). We

11

discuss each of these scenarios below.

### A. The messages contained information that only Smart could have been expected to know.

¶29. This Court affirmed the admission of social media messages into evidence where they contained information only the purported sender could be expected to know. *Ellis v. State*, 315 So. 3d 489, 499-500 (¶¶29-33) (Miss. Ct. App. 2020), *cert. denied*, 314 So. 3d 1164 (Miss. 2021). Defendant Tracy Ellis was convicted on two counts of fondling for molesting his stepdaughters. *Id.* at 493-94 (¶¶1, 11). At his trial, screenshots of messages Ellis had sent to one of his victims through the Google Hangouts application were admitted into evidence. *Id.* at 498 (¶27). On appeal, Ellis asserted that the trial court erred by admitting the messages because they had not been properly authenticated. *Id.*

¶30. In one of the messages, Ellis asked the victim if he could "hug [her] more like [he] did in the hallway?" *Id.* at 499 (¶29). The victim testified that the text came "immediately after the incident in which [Ellis] 'grabb[ed] her butt' in the hallway of their home." *Id.* at 499 (¶30). The victim "further testified that [Ellis] was the only other person who knew about the incident at the time the messages were sent"—i.e., the messages contained information that only the defendant could have been expected to know. *Id.* The Court specifically took these circumstances into account in holding that "the trial judge did not abuse his discretion by ruling that there was enough evidence to support a finding of authenticity" in that case. *Id.* at 500 (¶33).

¶31. Similarly, the Kik messages in this case contained information that only Smart could

12

have been expected to know. The exchange between Smart and C.R. was as follows:

[Smart]: Smd[9]

[C.R.]: What dick [laughing crying emojis]

[Smart]: The one that was in yo mouth

[C.R.]: That wasnt a dick that was a vienna

[Smart]: Regardless to wat u think u liked it

C.R. testified that these messages referred to the incident in Smart's classroom and that Smart had paid C.R. $50 "to keep quiet about it."

¶32.    In another message, Smart asked C.R., "When we gone get at it again" and offered to buy him a phone case in exchange for repeating the classroom incident.  C.R. testified that Smart "was saying that if I kept it quiet, he would buy a phone case," and that Smart "was trying to get [C.R.] to perform oral sex on him again once [Smart] got the [phone] case." When C.R. turned him down, Smart said, "I know wat I will do next time. I honestly think u scared[.]"

¶33.    We find that these messages contained details not known to anyone but Smart and C.R.—C.R. testified that Smart paid him to keep quiet about the incident, Smart offered him a phone case to "perform oral sex on him again," and there is no indication C.R. told anyone about the incident until September 15, 2015, when C.R. left the Kik application open on his phone so his mother could see the explicit messages that Smart had sent that afternoon.

---

[9] C.R. testified that "Smd" meant "Suck My Dick."

Additionally, with respect to the second message, the reference to "again" shows that Smart would have to coerce or bribe C.R. into allowing the activity to happen "again" and for C.R. to continue to keep it quiet. We find that these circumstances, particularly combined with the other factors discussed below, constitute "'evidence sufficient to support a finding' that the evidence was authentic." *Ellis*, 315 So. 3d at 500 (¶33) (quoting MRE 901(a)).

> **B.    Smart responded to the messages in such a way as to indicate circumstantially that he was the author of the communication.**

¶34.    A prima facie case of authenticity is also shown when "the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication." *Smith*, 136 So. 3d at 433 (¶21). For example, in one case, the supreme court found that text messages sent to the victim from a phone number attributable to the defendant (Tyrone Boyd) were properly authenticated when the defendant responded in such a way as to indicate authorship when he twice went to an agreed-upon location right after text messages agreeing to meet at the site were sent. *Boyd v. State*, 175 So. 3d 1, 6-7 (¶¶19-20) (Miss. 2015); *Falcon*, 311 So. 3d at 1189 (¶9) (finding that where the defendant sold the witness drugs "promptly and without further discussion," defendant responded in such a way as to indicate circumstantially that he was the same person who had exchanged messages with the witness moments before the drug sale).

¶35.    Similar to the defendants' actions in these cases, Smart's actions in the moments that followed the "callin['] the police" message indicate circumstantially that he was the same

14

person who had exchanged Kik messages with C.R. minutes before. A screenshot taken at 5:05 p.m. showed that the "callin['] the police" message was sent "a minute ago." Smart began repeatedly calling C.R.'s phone less than two minutes later. AT&T records show that Smart called C.R.'s phone at 5:07 p.m., 5:08 p.m., 5:09 p.m., and again at 5:21 p.m.

¶36. Further, the elementary school principal testified that at around 5:10 p.m., Smart was at the elementary school, specifically looking for C.R (after Smart could not get an answer on C.R.'s phone). Smart did not work at the elementary school, but he knew that C.R. would go there after school to get a ride home with his aunt, who did work there.

¶37. In short, we find that Smart's response to C.R.'s message about calling the police indicates circumstantially that he was the author of the Kik messages, thereby establishing a prima facie case of authenticity.

### C. Other circumstances peculiar to the case show authorship.

¶38. "[O]ther circumstances peculiar to the particular case may suffice to establish a prima facie showing of authenticity." *Boyd*, 175 So. 3d at 6 (¶16) (quoting *Smith*, 136 So. 3d at 433 (¶21)). In addition to relying on the "sender's response" example as a way in which social media messages may be authenticated, the supreme court in *Boyd* also found that the "peculiar circumstances" in that case were sufficient evidence of authenticity with respect to messages exchanged between a Tyrone Boyd Facebook account[10] and the victim. *Id.* at 5 (¶17). In Facebook communications, Boyd asked for the victim's phone number, which

---

[10] As noted, the defendant's name was Tyrone Boyd. *Boyd*, 175 So. 3d at 2 (¶1).

she gave to him. *Id.* at 5-6 (¶17). Regarding his own number, Boyd only gave the victim the first six digits of his phone number (601-481), claiming it was a new phone so he did not know the last four digits. *Id.* at 6 (¶17). The supreme court found the following "peculiar circumstances" were sufficient to establish the authenticity of the Facebook messages from the "Tyrone Boyd account," as follows:

> Boyd was arrested at the time and meeting place arranged in text messages originating from a number containing these six digits [(601-481)], with a phone containing [the victim's] phone number in his possession, and the messages also happened to be from Tyrone Boyd. Whether these peculiar circumstances are analogous to those contemplated in *Smith* is a question for this Court. We find the Facebook messages were properly admitted considering the circumstances laid out here.

*Id.* at 6 (¶18).

¶39. We likewise find that the "peculiar circumstances" in this case sufficiently authenticated the Kik messages. C.R. testified at trial that the screenshots showed Kik messages between himself and Smart. He knew the messages were from Smart because Smart personally gave him the username "smartgye" and said to contact him that way. C.R. also testified that the messages referred to the oral sex that occurred in Smart's classroom—and Smart paid C.R. to keep quiet about it. Further, as outlined above, after C.R. sent the "callin['] the police" message to Smart, Smart repeatedly called C.R.'s phone, as corroborated by C.R.'s and his mother's testimonies and the AT&T phone records. Additionally, the elementary school principal testified that Smart went there at about 5:10 p.m. that same day looking "specifically for [C.R.]."

16

¶40. Smart argues that his communications with C.R. were "simply texts between a mentor and mentee." As support, Smart points out that the AT&T phone records from April 2015 to September 16, 2015, only show the originating and terminating phone numbers—they do not show the content of any text messages or whether the messages were group texts. Although this is true, we observe that the phone records show forty or more communications between Smart and C.R. on some days, and although there were no communications in June or July, the communications began again in August 2015, after C.R. started high school and was no longer at DM Smith Middle School. And even if it could be reasonably believed that these communications were "simply between a mentor and mentee" based on this information, C.R. testified that this was not the case—Smart's communications never related to school. We find Smart's argument on this point is without merit.

¶41. In sum, based upon the particular circumstances in this case and the applicable law discussed above, we find the State made a prima facie showing of authenticity with respect to the Kik messages. We therefore find no abuse of discretion in the trial court's admitting the Kik messages into evidence.

## II. Prosecutorial Misconduct

¶42. Smart asserts the State committed prosecutorial misconduct by stating that "(1) unauthenticated KIK app messages sent to [C.R.] were from . . . Smart; and (2) that those unauthenticated KIK app messages correlated with a printout of [C.R.'s] AT&T account." The defense, however, apparently did not object on these grounds during the State's closing

17

arguments.[11]  "[W]hen a defendant does not object on the same grounds being raised in an argument on appeal, the issue is waived." *Wilson v. State*, 276 So. 3d 1241, 1253 (¶25) (Miss. Ct. App. 2018).  Accordingly, we find that this issue is procedurally barred because no objection on these grounds was made to the prosecution's closing argument during trial. *Goff v. State*, 14 So. 3d 625, 651 (¶102) (Miss. 2009) (finding that the defendant "never raised any objection at trial, or in his motion for a new trial, that the prosecution had engaged in misconduct of any kind, and therefore his claims are barred from consideration on direct appeal").  Procedural bar notwithstanding, we find that there was no prosecutorial misconduct in this case for the reasons addressed below.

¶43.  "The standard of review which this Court must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Wilson v. State*, 194 So. 3d 855, 864 (¶30) (Miss. 2016) (internal quotation marks omitted). "Attorneys are afforded wide latitude in arguing their cases to the jury, but they are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Galloway v. State*, 122 So. 3d 614, 643 (¶72) (Miss. 2013) (internal quotation mark omitted). In this regard, "[t]he purpose of a closing argument is to fairly sum up the evidence[;] . . .

---

[11] It appears from our review of the trial transcript that the defense's only objection during the State's closing arguments concerned time-stamps on the AT&T call log.  We address this issue in paragraph 47.

[t]he prosecutor may comment upon any facts introduced into evidence, and he may draw whatever deductions and inferences that seem proper to him from the facts." *Id.*

¶44. Smart asserts that because both experts "testified that the Kik app messages could not be linked to . . . Smart," the prosecutor inappropriately told the jury that Smart sent those messages to C.R. Smart disingenuously ignores that the extraction report from C.R.'s phone examined by both experts was generated *after* C.R. had deleted the Kik application on September 16, 2015, thereby deleting the supporting files for the application as well. Based upon the post-September 16, 2015 extraction report, both experts found that the Kik application was installed on October 3, 2015, and the Kik application installed at that time contained no data prior to October 3rd.

¶45. Nevertheless, as we have detailed above, we find that other evidence and circumstances in this case amply support our determination that the State presented sufficient evidence to authenticate the Kik messages and support the inference that Smart, indeed, sent the Kik messages to C.R. Because "[a] prosecutor is entitled to argue inferences based upon the evidence at trial," *Holland v. State*, 705 So. 2d 307, 345 (Miss. 1997), we find no merit in Smart's prosecutorial-misconduct contention on this point.

¶46. We also find without merit Smart's contention that the State inappropriately referred to the AT&T records relating to C.R.'s phone in closing arguments apparently because they did not prove the content of any text messages sent or whether they were group texts. We have already recognized above that the State did not present any evidence of the content of

19

text messages or if they were group texts—and we specifically find here that the State did not say or imply in closing arguments that it had done so. Rather, the State presented the AT&T records to show when communications were sent between Smart's phone and C.R.'s phone. As we discussed above, Smart's response to C.R.'s "callin['] the police" message supports an inference that he was the person who had been exchanging Kik messages with C.R. C.R. and his mother testified that Smart began calling C.R.'s phone right after the "callin['] the police" message was sent, and the AT&T records corroborate that a number belonging to Smart began calling C.R. within two minutes of the Kik message being sent. The jury also heard the testimony from Walker, the records custodian for AT&T, explaining that they would need to subtract five hours from the UTC on the phone records to adjust for Central Daylight Savings Time. Thus we find nothing inappropriate in the prosecutor's closing statement that the jury could "do the math" in making this determination.

¶47. We recognize that the defense appears to have objected to the State's closing argument concerning the UTC time-stamps on the AT&T records, but based upon our review of the trial transcript, it also appears that any objection was withdrawn. In particular, the defense objected to the State's referring to the AT&T phone log record because "it was not the right time-stamp." The prosecutor, however, reminded the defense of Walker's testimony about the time-stamps and said, "The jury can do the math for themselves." The defense then appeared to withdraw his objection, stating, "As long as they can do the math, I'm good. I'm good, Your Honor." For this additional reason, we find that any assignment of error based

20

upon the State's "do the math" statement is entirely without merit.

### III. Cumulative Error

¶48. Lastly, Smart vaguely refers to the "cumulative-error doctrine" in his brief, which is a doctrine recognizing that "individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Harding v. State*, 17 So. 3d 1129, 1133 (¶13) (Miss. Ct. App. 2009) (quoting *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007)). Because we find no individual errors, we find the cumulative-error doctrine does not apply here. *Cf. Batiste v. State*, 121 So. 3d 808, 873 (¶184) (Miss. 2013) (holding that one error, without other errors, cannot be cumulative error).

### CONCLUSION

¶49. For the reasons stated, we affirm Smart's conviction and sentence.

¶50. **AFFIRMED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**